**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 21-cr-10208-NMG(s) |
| PATRICK O'HEARN, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**
**EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT**

The United States, by and through Assistant United States Attorney Alathea E. Porter, respectfully opposes the defendant Patrick O'Hearn's Motion to Suppress Evidence Seized Pursuant to Search Warrant and Request for Evidentiary Hearing. Docket Nos. 295 (Motion) and 297 (Memorandum of Law in Support) (collectively, the "Motion"). In the Motion, defendant Patrick O'Hearn (hereinafter, "O'Hearn") moved to suppress the evidence seized from his then residence in Braintree, Massachusetts, claiming that the affidavit filed in support of the search warrant lacked probable cause to believe that a crime had been committed or that evidence of a crime would be found at that location. The Motion is meritless, and the Court should deny it without a hearing.

**PROCEDURAL BACKGROUND**

In or about October 2020, the Federal Bureau of Investigation ("FBI") began an investigation into the drug trafficking activities of James Holyoke (hereinafter, "Holyoke"). Over the course of the investigation, agents utilized multiple different investigative tools, including controlled purchases of evidence, physical and electronic surveillance, and court-authorized wire and electronic interceptions.

Beginning in late October 2020 and continuing through March 2021, investigators utilized

a cooperating witness (hereinafter, the "CW") to complete controlled purchases of methamphetamine from Holyoke and his criminal associates, including from Holyoke's source of methamphetamine supply, Reshat Alkayisi (hereinafter, "Alkayisi"). During one of those controlled purchases, Holyoke also told the CW about another source of supply named "Patrick," which is O'Hearn's first name.

On May 5, 2021, the Honorable Denise J. Casper, United States District Judge, District of Massachusetts, authorized the interception of wire and electronic communications to and from a telephone used by Alkayisi (hereinafter, the "Target Telephone") for a period of thirty days. *See* 21-91306-DJC. Interceptions over the Target Telephone began on May 6, 2021. On June 4, 2021, Judge Casper authorized the continued interception of wire and electronic communications to and from the Target Telephone for an additional period of thirty days. Interceptions terminated on July 3, 2021.

During the periods of interception, investigators intercepted numerous wire and electronic communications during which Alkayisi used the Target Telephone to arrange narcotics transactions and to discuss collecting drug proceeds for narcotics previously supplied on credit. Investigators identified multiple regular methamphetamine customers of Alkayisi, including Holyoke and O'Hearn, among others.

On July 7, 2021, a federal grand jury sitting in Boston, Massachusetts returned an indictment charging Alkayisi, Holyoke, and seven others with controlled substance and firearm offenses, including conspiracy to distribute and to possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Section 846. *See United States v. Reshat Alkayisi*, *et al.*, 21-cr-10208-NMG, Docket No. 1. The same day, United States Magistrate Judge Judith G. Dein authorized a warrant to search 501 Commerce Drive, Unit 4204, Braintree,

Massachusetts.  FBI Special Agent Maria Classon filed an affidavit in support of the application for a search warrant (hereinafter, the "Classon Affidavit"), which is attached to the Motion as Exhibit 1.  The Classon Affidavit identified Unit 4204 at 501 Commerce Drive as O'Hearn's residence (hereinafter, "O'Hearn's Residence").  *See* Classon Affidavit, at ¶ 5.b. and Attachment A-2.  The search warrant permitted agents to search for documents and records evidencing drug trafficking, money laundering, cash, documents or personal property showing ownership or control of the premises, and cellular telephones.

In the early morning of July 8, 2021, at approximately 6:00 a.m., agents arrived at O'Hearn's Residence.  Upon executing the warrant, agents found over 600 grams of pure methamphetamine, a large quantity of ketamine, cocaine, 22 assorted size bottles of GHB, hallucinogenic mushrooms, and MDMA tablets.  Agents also seized over $23,000 in cash.

Agents arrested O'Hearn following the search of his residence and he was charged by federal criminal complaint.  On September 1, 2021, a federal grand jury sitting in Boston, Massachusetts returned a superseding indictment charging O'Hearn, Alkayisi, Holyoke, and nine other individuals with controlled substance, money laundering, and firearm offenses.  *See* 21-cr-10208-NMG(s), Docket No. 86.

## RELEVANT FACTUAL BACKGROUND

The Classon Affidavit described a months-long investigation into the drug trafficking activities of Alkayisi, Holyoke, and other members of their drug trafficking organization ("DTO"), including O'Hearn.  *See* Classon Affidavit, at ¶¶ 8-38.  Based on interceptions, surveillance, information obtained during a controlled purchase, as well as review of bank records, agents identified O'Hearn as a criminal associate of Alkayisi.  *See id.*, at ¶¶ 12, 26-30, and 33-37.

Between October 2020 and April 2021, at the direction of agents, the CW completed twelve

controlled purchases of methamphetamine from Holyoke, Alkayisi, and their associates. *See id.*, at ¶¶ 9-10. The controlled purchases from Holyoke, Alkayisi, and their associates, resulted in the seizure of approximately 12 pounds (more than 5 kilograms) of methamphetamine. *See id.* During the first controlled purchase, on October 28, 2020, Holyoke told the CW about someone named "Patrick" in Braintree, who Holyoke "deals with." *Id.*, at fn. 1. Based on the investigation, Agent Classon interpreted Holyoke to mean that he obtained methamphetamine from Patrick O'Hearn, who – at the time – resided in Braintree, Massachusetts. *See id.*

On March 10, 2021, court authorized precise location information for telephones used by Holyoke and Alkayisi indicated that they were both in the area of O'Hearn's Residence. *See id.*, at ¶ 27. Once agents got to that location, they observed both Holyoke's and Alkayisi's vehicles (empty) parked in the visitor parking lot for O'Hearn's Residence. *See id.* Based on her knowledge, training and experience, as well as her participation in the investigation, Agent Classon stated her belief that Alkayisi and Holyoke were meeting at O'Hearn's Residence to exchange drugs or for Holyoke to pay Alkayisi for drugs previously supplied on credit. *See id.*

On April 3, 2021, court authorized GPS data for a car used by one of Alkayisi's regular methamphetamine customers, Robyn Costa (hereinafter, "Costa"), as well as court authorized GPS data for Alkayisi's car and court authorized precise location data for Alkayisi's telephone, indicated that Alkayisi and Costa met in Braintree, Massachusetts. *See id.*, at ¶ 28. Shortly thereafter, GPS data for Alkayisi's car and location data for his phone indicated that he was in the visitor parking lot at O'Hearn's Residence. *See id.* After leaving O'Hearn's residence, agents observed Alkayisi drive to Dorchester, Massachusetts to meet with Joseph Founds (hereinafter, "Founds"), who agents identified as a criminal associate of Alkayisi who helped Alkayisi store

methamphetamine and drug proceeds.[1]  *See id.*, at ¶¶ 12 and 28.  Later that same day, at the request of agents, Massachusetts State Police conducted a traffic stop of Costa.  *See id.*, at ¶ 29.  During that stop, investigators seized approximately five (5) pounds of methamphetamine from Costa's car.  *See id.*  After being advised of her rights, Costa told investigators that she met with her methamphetamine supplier in Braintree earlier that day, and that he had supplied her with the methamphetamine they seized from her car.  *See id.*  Based on her training and experience, and knowledge of the investigation, Agent Classon stated her belief that during the above described meetings, Alkayisi delivered methamphetamine to Costa, O'Hearn, and then Founds.  *See id.*, at ¶ 30.

As noted above, beginning on May 6, 2021, investigators began intercepting a telephone used by Alkayisi (the "Target Telephone").  *See id.*, at ¶ 11.  Agents intercepted multiple calls and text messages related to O'Hearn.  Additionally, agents intercepted approximately twenty-one (21) text messages to the Target Telephone from Chase QuickPay with Zelle, notifying Alkayisi that O'Hearn paid him various amounts.  *See id.*, at fn. 1.  Between May 7, 2021 and July 1, 2021, those payments totaled $25,100.  *See id.*  Based on the investigation, Agent Classon stated her belief that these payments from O'Hearn to Alkayisi were payments for methamphetamine.  *See id.*

On May 12, 2021, interceptions and surveillance indicated that Alkayisi made deliveries of methamphetamine to multiple drug customers, including O'Hearn.  *See id.*, at ¶¶ 31-34.  First, based on interceptions, agents believed that Alkayisi planned to deliver four (4) pounds of methamphetamine ("I'll give you four") to Eric Daneault (hereinafter, "Daneault").  *See id.*, at

---

[1] During the first controlled purchase on October 28, 2020, Holyoke told the CW that he met his current methamphetamine supplier through "Joey," which based on the investigation, Agent Classon believed to refer to Joseph Founds.  *See* Classon Affidavit, at fn. 2.

¶ 31.  During one of the intercepted calls setting up the deal, Alkayisi asked Daneault if he had tried his methamphetamine ("you've seen my supply, right?  My product?") and Daneault replied, Oh yeah, yeah of course, uh everybody likes that stuff, yeah."  Alkayisi then said, "You're gonna get nice, big crystals."  *See id.*, at fn. 4.  That night, agents observed Alkayisi and Daneault meet in the parking lot of the Square One Mall in Saugus, Massachusetts.  *See id.*, at ¶ 31.

Approximately ten minutes after that apparent drug deal with Daneault, agents intercepted a call from Alkayisi to Kelsie Seiden (hereinafter, "Seiden"), who agents identified as one of Alkayisi's significant others.  *See id.*, at ¶ 32.  During the call, Alkayisi told Seiden, "One down, two to go," and then told her he was on his "way to see Joey," which Agent Classon interpreted to be a reference to Founds.  *See id.*  Seiden asked Alkayisi if he was collecting money or just dropping stuff off, and Alkayisi replied, "both," which Agent Classon interpreted to mean delivering drugs and collecting money.  *See id.*  Shortly thereafter, agents intercepted a call between Alkayisi and Christina Lua (hereinafter, "Lua"), who agents identified as another one of Alkayisi's significant others.  *See id.*  During that call, Alkayisi similarly told Lua, "I have one down two to go," which Agent Classon interpreted to mean that he had delivered methamphetamine to one customer, and still had two customers to deliver methamphetamine to. *See id.*

After meeting with Daneault, agents followed Alkayisi as he drove to Dorchester to meet with Founds.  *See id*., at ¶ 33.  Through electronic surveillance, agents observed Founds meet with Alkayisi at Alkayisi's car, and they observed Founds pass a brown paper bag to Alkayisi.  *See id.* Agents then followed Alkayisi as he drove to O'Hearn's Residence.  *See id.*  Based on the background of the investigation, Agent Classon stated her belief that Alkayisi obtained methamphetamine from Founds prior to meeting with his next methamphetamine customer,

6

O'Hearn.  *See id.*

Agents observed Alkayisi parked in the parking lot at O'Hearn's Residence.  *See id.*, at ¶ 34.  Agents then intercepted a call between Alkayisi and Seiden, during which Alkayisi told Seiden that he was at "Patrick's," which Agent Classon believed to be a reference to O'Hearn's Residence.  *See id.*  Alkayisi told Seiden that "Patrick" was not home and that he had to wait for him.  *See id.*  Approximately forty-five minutes later, agents observed O'Hearn exit a vehicle and walk towards his residence, and also observed at that time that Alkayisi's car was unoccupied.  *See id.*  A short time after that, agents observed Alkayisi exit the apartment complex where O'Hearn's residence is located, go back into his car and drive away.  *See id.*  Based on the interceptions and surveillance, Agent Classon stated her belief that Alkayisi supplied O'Hearn with methamphetamine that night.  *See id.*, at ¶ 34 and fn. 5 (describing interceptions between Alkayisi and O'Hearn that indicated they may have used an encrypted application to set up a narcotics transaction).

Additional interceptions indicated that Alkayisi supplied O'Hearn with methamphetamine, and that O'Hearn allowed Alkayisi to store methamphetamine at O'Hearn's Residence.  *See id.*, at ¶ 35.  For example, on May 19, 2021, agents intercepted communications in which Alkayisi made arrangements for his criminal associate Brian Keleman (hereinafter, "Keleman") to deliver eight (8) pounds of methamphetamine to Holyoke.  *See id.*  During one call, Alkayisi told Keleman that he was going to "save you a trip to come meet up with me in Braintree," and said, "James is needing eight," which Agent Classon interpreted to mean that Holyoke wanted eight (8) pounds of methamphetamine.  *See id.*  Alkayisi then instructed Keleman where to find methamphetamine on his property (the "empty barn," with "the loft") and he instructed Keleman to "wrap up four in each bag." *See id.*  Agent Classon also stated her belief that when Alkayisi told Keleman he was

going to "save" him a "trip to Braintree," and instructed him to go to the "barn," Alkayisi meant that Keleman could retrieve the methamphetamine for Holyoke from Alkayisi's property in Rhode Island ("barn") and that Keleman did not have to go to O'Hearn's residence ("Braintree") to get the eight (8) pounds of methamphetamine for Holyoke.  *See id.*

The following day, on May 20, 2021, agents observed Alkayisi go into the building where O'Hearn's Residence was located, carrying a black briefcase style bag.  *See id.*, at ¶ 36.  Less than one hour later, agents observed Alkayisi leave the building carrying a different and larger bag, that appeared to be a soft-sided cooler.  *See id.*  Based on the investigation and her training and experience, Agent Classon stated her belief that Alkayisi traveled to O'Hearn's Residence to collect methamphetamine for further distribution.  *See id.*

Over the course of the investigation, agents also learned that Alkayisi used O'Hearn's residential address as the principal office location for Alkayisi's shell corporation, ALKC LLC. *See id.*, at ¶ 37.  Alkayisi incorporated the business ALKC CORP in Rhode Island in October 2018, however, the business was administratively revoked for failure to file an annual report.  *See id.*  In January 2021, Alkayisi incorporated the business ALKC LLC in Massachusetts and listed O'Hearn's Residence as the principal office location.  *See id.*  Per the Certificate of Organization filed with the Massachusetts Secretary of State, Alkayisi is the only listed manager associated with the ALKC LLC business, which is described in the filing as a "consultant service – consult and provide tools for farmers who produce vegetables."  *See id.*  Based on a review of the business bank accounts, there was no evidence to suggest that the business provided any consulting services or provided any farming tools or assistance to farmers.  *See id.*  On the contrary, in addition to the methamphetamine operation, the only other business activities Alkayisi was known to conduct was a marijuana grow operation in Rhode Island.  *See id.*  Alkayisi was not licensed in Rhode Island

to operate a marijuana grow operation.  *See id.*  Based on the investigation, Agent Classon stated
her belief that Alkayisi used ALKC LLC as a front to launder money from his illicit drug
trafficking, and that he used O'Hearn's Residence as the business address for ALKC LLC in effort
to conceal the drug proceeds from law enforcement detection.  *See id.*

<u>Agent Classon's Experience</u>

The Classon Affidavit recounted Agent Classon's experience investigating drug traffickers
and money launderers, including her experience executing search warrants at residences of drug
traffickers and money launderers.  *See id.*, at ¶¶ 1-3, 39-52.  Agent Classon described the types of
items that, in her experience, are commonly found at the residences of drug traffickers and money
launderers, including, but not limited to: drug paraphernalia; cash; records related to amounts paid
and amounts owed; records related to obtaining, transferring, laundering, concealing, or expending
money or other items of value made or derived from trafficking in controlled substances;
documents tending to identify the person who resides at the location; as well as cellular telephones,
and the information that is often stored on such devices.  *See id.*, at ¶¶ 39-52.  Agent Classon
further explained, that in her experience, people who sell illegal drugs and launder money regularly
keep records of their illegal activities, and that these records are often found in the homes of those
individuals.  *See id.*

**ARGUMENT**

O'Hearn claims that the search of his residence was not supported by probable cause.  *See*
the Motion, at p. 2.  The Classon Affidavit established more than sufficient probable cause to
believe that a crime had been committed, and that evidence of that crime would be found at
O'Hearn's Residence.  The Classon Affidavit demonstrated that O'Hearn lived at the location to
be searched, and it presented sufficient facts for the Magistrate Judge to infer that O'Hearn was a

member of a methamphetamine conspiracy, who regularly obtained methamphetamine from Alkayisi, that Alkayisi was a methamphetamine supplier who utilized O'Hearn's Residence to store drugs, and that Alkayisi listed O'Hearn's address as the principle address for his shell company.    Taken together, the facts presented in the Classon Affidavit demonstrated a fair probability that evidence of drug trafficking and money laundering would be found at O'Hearn's Residence.    Moreover, agents relied in good faith on the warrant issued when they executed the search of O'Hearn's Residence.    As such, the Motion should be denied.

## A.    The Classon Affidavit Provided Ample Evidence to Support a Finding of Probable Cause

As the First Circuit has "repeatedly emphasized, '[a]n affidavit supporting a search warrant is presumptively valid." *United States v. McLellan,* 792 F.3d 200 (1st Cir. 2015) *cert. denied*, 136 S. Ct. 494 (2015) (quoting *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013)). "Where a defendant challenges the legality of a search conducted pursuant to a search warrant, the defendant bears the burden of showing by a preponderance of the evidence that the search was unlawful." *United States v. Galloway*, No. CR 19-10162-DJC, 2020 WL 4369648, at *2 (D. Mass. July 30, 2020).

In this case, Magistrate Judge Dein found probable cause based on the Classon Affidavit and that determination is subject to substantial deference. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir. 1996).  This Court may "reverse the magistrate judge's initial evaluation only if [it sees] no substantial basis for concluding that probable cause existed."  *United States v. Dixon*, 787 F.3d 55, 58-59 (1st Cir. 2015) (quoting *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005)).  A reviewing court accords "considerable deference to reasonable inferences the [issuing judge] may have drawn from the attested facts." *United States v. Tiem Trinh*, 665 F.3d 1, 10 (1st Cir. 2011) (quoting *Zayas–Diaz*, 95 F.3d at 111).

The Court's review is restricted to the sufficiency of the affidavit on which the warrant was issued. *See Gates*, 462 U.S. at 239.

A warrant application demonstrates probable cause when it shows that "(1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called 'nexus' element." *Dixon*, 787 F.3d at 59 (quoting *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999)). The existence of probable cause is determined by evaluating the totality of the circumstances. *Gates,* 462 U.S. at 231; *see also United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013) ("Probable cause exists when the totality of the circumstances suggests that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"). The determination "does not demand proof beyond a reasonable doubt." *United States v. Coombs*, 857 F.3d 439, 446 (1st Cir. 2017). Rather, the government need only establish a "fair probability" or a "reasonable likelihood" that evidence of a crime will be found. *United States v. Rivera*, 825 F.3d 59, 63 (1st Cir. 2016). "[W]hile underlying circumstances must be recited, affidavits should be construed in a commonsense manner and ... doubtful cases should be resolved in favor of the warrant." *United States v. Heyer*, No. CR 15-10256-RGS, 2018 WL 6834591, at *1 (D. Mass. Dec. 27, 2018) (Stearns, J.) (quoting *Rosencranz v. United States*, 356 F.2d 310, 316 (1st Cir. 1966)).

The Commission Element. In the Motion, O'Hearn states—without any argument in support—that the Classon Affidavit does not set forth probable cause that any crime had been committed. *See* the Motion, at p. 2. That blanket assertion is wholly without merit and the Court should reject it. Considering the totality of the circumstances, and all of the facts set forth in the Classon Affidavit as a whole, there was certainly a "fair probability" that a crime—indeed multiple crimes—had been committed. The fact that agents successfully completed twelve controlled

purchases totaling approximately twelve pounds (12) of methamphetamine from Alkayisi, Holyoke, and their criminal associates, *alone*, was more than sufficient for the Magistrate Judge to find probable cause that a crime had been committed. *See Rivera*, 825 F.3d at 63 (Probable cause requires only a "fair probability" or "reasonable likelihood," it does not "demand certainty, proof beyond a reasonable doubt, or even proof by a preponderance of the evidence") (internal quotations omitted). Yet, the Classon Affidavit provided much more. Indeed, The Classon Affidavit contained fourteen (14) detailed pages describing the drug trafficking activities of a large-scale methamphetamine drug ring. *See* Classon Affidavit, at ¶¶ 8-38. It strains credulity to suggest that the Classon Affidavit lacked probable cause to believe that a crime had been committed.

<u>The Nexus Element</u>. In the Motion, O'Hearn does not dispute that the Classon Affidavit established probable cause that the location to be searched was his residence.[2] Rather, O'Hearn appears to argue only that the Classon Affidavit failed demonstrate a nexus between O'Hearn's residence and any criminal activity. *See* the Motion, at pp. 4-6 (citing only legal standard with respect to whether evidence of a crime will be found in a particular place). "[P]robable cause does not demand certainty, or proof beyond a reasonable doubt, or even proof by a preponderance of the evidence—it demands only a fair probability that contraband or evidence of a crime will be found in a particular place." *Rivera*, 825 F.3d at 63. In making this assessment, courts may infer a nexus to a defendant's residence when "generalized observations" that drug dealers tend to store

---

[2] In the Motion, O'Hearn claims that the Classon Affidavit contains "no description of where O'Hearn's unit is located." *See* the Motion, at p. 6. This is plainly incorrect. *See* Classon Affidavit, Attachment A-2, describing the location to be searched ("Unit 4204 is located on the second floor of Building 4 at 501 Commerce Drive. The only entrance/exit to Unit 4204 is from an interior hallway, which can be accessed via an elevator or interior stairs. Building 4 has entrances on the front, left, and right sides of the building, all of which are locked.").

evidence in their homes are "combined with specific observations," or facts connecting the drug dealing to the home. *Ribeiro*, 397 F.3d at 50-51.

In his attempt to negate probable cause, O'Hearn invites the Court to consider the facts set forth in the Classon Affidavit each in isolation, yet that is the opposite of what this Court must do. Rather, the Court must consider the "totality of the circumstances" in assessing probable cause. *Tiem Trinh*, 665 F.3d at 10. The totality of the circumstances standard reflects "the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Gates*, 462 U.S. at 231. Indeed, the magistrate judge is called upon to make a "practical, common-sense decision." *Ribeirio*, 397 F.3d at 49.

O'Hearn argues that the Classon Affidavit did not establish probable cause because it did not include evidence that O'Hearn provided drugs to a CW, that O'Hearn was ever observed directly with Alkayisi or Holyoke, or that the anyone directly saw drugs delivered to O'Hearn. *See* the Motion, at p. 5-6. Of course, such direct observations are not required. The nexus need not, and typically will not, rely on direct observation, but rather may be "inferred from the type of crime, the nature of the items sought… plus normal inferences as to where a criminal would hide evidence of his crime." *Feliz*, 182 F.3d at 88.

O'Hearn also argues that the money transfers "are not evidence of drug sales, purchases, or distribution," and that "there are many reasons why an individual might transfer money electronically from their bank account to that of another." Motion, at p. 5. While the fact of money transfers might alone be insufficient to establish probable cause, when considering the totality of the circumstances, the fact that O'Hearn made multiple money transfers that totaled $25,100 to Alkayisi over the course of just two months, combined with all of the other facts set forth in the Classon Affidavit as a whole, the Classon Affidavit certainly established a "fair probability" that

evidence of a crime would be found at the place to be searched.  Similarly, the references by Holyoke and Alkayisi to "Patrick" who lived in "Braintree," in isolation may not have risen to the level of establishing probable cause.  But when all of the facts set out in the Classon Affidavit are considered in combination, it easily passes the threshold for establishing probable cause.

Indeed, the Classon Affidavit included many facts beyond just the money transfers and the references to "Patrick" and "Braintree."  Those facts are set forth in detail above, and therefore are only summarized below:

- Agents conducted twelve controlled purchases totaling over twelve (12) pounds of methamphetamine from Alkayisi and Holyoke.

- Holyoke identified O'Hearn (by first name and city of residence) as one of his methamphetamine dealers.

- Agents identified O'Hearn as a regular methamphetamine customer of Alkayisi, based on interceptions, surveillance, and bank records.

- O'Hearn made twenty-one (21) money transfers to Alkayisi totaling $25,100 over the course of two months (May to July 2021); the most recent transfer was one week prior to the search warrant being issued.

- Agents observed Alkayisi travel to O'Hearn's Residence on multiple occasions, and intercepted communications indicating that Alkayisi was delivering methamphetamine to O'Hearn on some of those occasions, as well as to other methamphetamine customers.

- Agents seized methamphetamine from one customer (Costa), the same day that Alkayisi also met with O'Hearn.  Costa told agents that she obtained the methamphetamine from her supplier that day.

- Interceptions indicated that Alkayisi stored methamphetamine at O'Hearn's residence, which agents believe Alkayisi used to launder his drug proceeds.

- Alkayisi used O'Hearn's Residence as the principle address for his shell company.

The evidence summarized above, and set forth in detail *supra* at pp. 1-8, was more than sufficient to establish probable cause to believe that evidence of a crime would be found at O'Hearn's Residence.  Considering all of this information as a whole, the Classon Affidavit

provided overwhelming evidence of a large-scale methamphetamine drug ring led by Alkayisi, and of which O'Hearn was a key player. The Classon Affidavit described multiple individuals who identified O'Hearn as a member of the drug ring; it also established by a fair probability that O'Hearn was one of Alkayisi's methamphetamine customers, who allowed Alkayisi to store drugs at his residence and use his residential address for Alkayisi's shell company, which Alkayisi used to launder his drug proceeds. Based on all of the evidence provided in the Classon Affidavit, it was reasonable to infer that that evidence of drug trafficking and/or money laundering would be found in O'Hearn's Residence. *See United States v. Hershenow*, 680 F.2d 847, 852 (1st Cir. 1982) ("[T]he magistrate is entitled to go beyond the averred facts and draw upon common sense in making reasonable inferences from those facts.").

Here, the types of crimes at issue—drug trafficking and money laundering—as Agent Classon explained in her Affidavit, are crimes for which evidence is routinely found at a drug dealer's home. As the First Circuit has observed, courts may infer a nexus to a defendant's residence when "generalized observations" that drug dealers tend to store evidence in their homes are "combined with specific observations," or facts connecting the drug dealing to the home. *Ribeiro*, 397 F.3d at 50-51.

The First Circuit, "with a regularity bordering on the echolalic, endorsed the concept that a law enforcement officer's training and experience may yield insights that support a probable cause determination." *United States v. Floyd*, 740 F.3d 22, 35 (1st Cir. 2014). Here, Agent Classon's generalized observations based on her training and experience were also supported by specific facts about Alkayisi's drug dealing activities and their connection to O'Hearn's Residence. Based on all of the facts stated above, buttressed by Agent Classon's experience and training, and knowledge of the entire case, it is a simple, common-sense, inference that evidence of drug

trafficking and/or money laundering would be found in O'Hearn's Residence.  *See United States v. Hershenow*, 680 F.2d at 852.

The Evidence Relied Upon Was Not Stale.  O'Hearn argues that the evidence in the Classon Affidavit was too stale to support a finding of probable cause that evidence of a crime would be found at his residence.  *See* the Motion, at p. 7.  He claims the most recent evidence linking his residence to the offense is thirty-eight days old.  *See id.*  This argument ignores critical facts, and the Court should reject it.  The Classon Affidavit included evidence that O'Hearn paid Alkayisi for drugs as recently as one week prior to the issuance of the warrant.  *See* Classon Affidavit, at fn. 1.

Moreover, when evaluating a claim of staleness, the Court does "not measure the timeliness of information simply by counting the number of days that have elapsed."  *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008); *see also United States v. Adams*, 971 F.3d 22, at 33 (1st Cir. 2020) ("We have repeatedly refused to assess an affidavit's staleness by counting the number of days between the events described in the affidavit and the warrant's issuance, as a merchant would beads on an abacus.") (quoting *Tiem Trinh*, 665 F.3d at 13).  Rather, the Court "must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." *Morales-Aldahondo*, 524 F.3d at 119.

The Supreme Court has supported this position stating: "faulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution." *Kentucky v. King*, 563 U.S. 452, 467 (2011).  The First Circuit has agreed with the Second and Ninth Circuits in holding that probable cause, especially in drug cases, can exist for years before becoming stale.  *See Feliz*, 182 F.3d at 87 (citing, *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two year-old information

16

relating to marijuana operation not stale); and *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991)); *see also Adams*, 971 F.3d at 33 (passage of one month not too stale).

Critically, the type of evidence the warrant at issue sought (*i.e.,* documents, currency, cellular phones, and other records constituting evidence, fruits, or instrumentalities of drug distribution and money laundering; not drugs) supported the issuance of that warrant, even if an extended period of time had transpired between the relevant conduct and the issuance of the warrant. As the First Circuit noted in *Rivera*, 825 F.3d at 63, this distinction in the "nature of the items sought" is meaningful to the Court's inquiry. *See also Feliz*, 182 F.3d at 87 (finding that evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after the last transaction).

The investigation at issue related to both drug trafficking and money laundering, and the Classon Affidavit presented evidence that O'Hearn was involved in both types of offenses. As such, the evidence sought in the search warrant included records related to businesses and financial records; the types of evidence that are routinely found months, if not years, after the offense. *United States v. Procopio*, 88 F.3d 21, 26 (1st Cir. 1996) (information not stale despite fact that crime took place 14 months before, because that did not eliminate the likelihood that the paper trail of financial records could be found in the residence).

Finally, the Classon Affidavit established a pattern of instances involving O'Hearn's Residence in connection with Alkayisi's methamphetamine sales; including evidence of multiple money transfers from O'Hearn to Alkayisi in the two months leading up to the search, the most recent of which was one week prior to the issuance warrant. *See* Classon Affidavit, at ¶¶ 26-36 and fn. 1. In such cases, the First Circuit has routinely held that it is reasonable to infer that evidence of the crime will be found in the residences of those involved for an extended period of

time.  *See United States v. Rose*, 914 F.Supp.2d 15, 16 (D. Mass. Sept. 14, 2012) (Gorton, J.)

(denying motion to suppress where period of six months that elapsed between evidence linking

defendant to conspiracy and the issuance of a search warrant); *see also United States v. Nocella*,

849 F.2d 33, 40 (1st Cir. 1998) ("A primary consideration in evaluating the staleness issue is

whether the affidavit describes a single transaction or a continuing pattern of criminal activity);

*Feliz*, 182 F.3d at 87 (rejecting defendant's staleness challenge, noting that courts have upheld

determinations of probable cause where evidence is as much as two years old).   Yet, the Court

need not reject the staleness argument on these grounds, since in addition to the pattern of drug

transactions in the case, the Classon Affidavit included evidence that O'Hearn paid Alkayisi for

drug transactions as recently as one week prior to the issuance of the warrant, and that other drug

transactions occurred out of O'Hearn's Residence a little over one month earlier.  The claim of

staleness must fail.

**B.  <u>Investigators Relied in Good Faith on the Warrant Issued</u>**

Even assuming arguendo that O'Hearn successfully challenged Magistrate Judge Dein's

probable cause determinations, the evidence obtained pursuant to the search warrant would remain

admissible under the "good faith" exception to the Fourth Amendment's exclusionary remedy.  In

*United States v. Leon*, 468 U.S. 897, 900, 922 (1984), the Supreme Court ruled that where law

enforcement officers act in "objectively reasonable reliance" on a search warrant issued by a

"detached and neutral magistrate" ultimately found to be lacking in probable cause, the evidence

seized remains admissible.  The Supreme Court stated:

> It is the magistrate's responsibility to determine whether the officer's
> allegations establish probable cause and, if so, to issue a warrant comporting
> in form with the requirements of the Fourth Amendment.  In the ordinary
> case, an officer cannot be expected to question the magistrate's probable
> cause determination or [her] judgment that the form of the warrant is

> technically sufficient.  "Once the warrant issues, there is literally nothing
> more the policeman can do in seeking to comply with the law."

*Id.* at 921 (quoting *Stone v. Powell*, 428 U.S. 465, 498 (1976)).  Indeed, the "exclusionary rule is

designed to deter police misconduct rather than to punish the errors of judges and magistrates."

*Id.* at 916.  "In the ordinary case, an officer cannot be expected to question the magistrate's

probable-cause determination or [her] judgment that the form of the warrant is technically

sufficient."  *Id.* at 921.  The test is "whether a reasonably well trained officer would have known

that the search was illegal despite the magistrate's authorization."  *Id.* at 922, n. 23.

"In the absence of any allegation that the magistrate judge was misled by information that

the affiant provided that was false or that he would have known to be false but for his reckless

disregard for truth, that the magistrate judge abandoned [her] detached and neutral role in issuance,

that the affidavit was so lacking in indicia of probable cause that reliance upon it was unreasonable

or that the warrant was so facially deficient that the agents could not have reasonably concluded

that it was valid, the [good faith] exception applies."  *Galloway*, 2020 WL 4369648, at *4.

Here, there is no claim that Magistrate Judge Dein abandoned her detached and neutral role

or that the warrant was facially deficient.  Even if somehow reasonable minds could differ about

whether the Classon Affidavit established probable cause to believe evidence of drug trafficking

and money laundering would be found in O'Hearn's Residence, it cannot be said that the Classon

Affidavit was "so lacking in indicia of probable cause as to render official belief in its existence

entirely unreasonable."  *Leon*, 478 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-611

(1975) (Powell J., concurring in part)).

As detailed above, agents firmly established the location to be searched as O'Hearn's

residence.  The Classon Affidavit also provided evidence that O'Hearn was a methamphetamine

customer of Alkayisi, that O'Hearn also supplied Holyoke, and that O'Hearn allowed Alkayisi to

utilize his residence to store drugs and as the principle address for Alkayisi's shell company, which Alkayisi used to launder his drug proceeds. The evidence supported the inference that O'Hearn bought methamphetamine from Alkayisi as recently as a week before the issuance of the warrant. This evidence would provide any reasonable officer with an objective belief that the warrant was valid. This is a far cry from the rare cases where an affidavit is so clearly insufficient as to warrant the "extreme sanction of exclusion." *Leon*, 468 U.S. at 926. Thus even if the Court concludes that the magistrate erred by issuing the challenged warrant, the Court should apply the good faith exception and deny the Motion.

## CONCLUSION

Because there were ample facts supporting Magistrate Judge Dein's finding of probable cause to issue the warrant, and because agents seized evidence from O'Hearn's Residence in good faith reliance on the warrant issued by a neutral magistrate, the Court should deny O'Hearn's Motion to Suppress in full.

Dated: March 17, 2023

                                     Respectfully submitted,

                                     RACHAEL S. ROLLINS
                                     United States Attorney

By:     /s/ *Alathea E. Porter*
                Alathea E. Porter
                Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I, Alathea E. Porter, Assistant U.S. Attorney, do hereby certify that on March 17, 2023, I served a copy of the foregoing on all registered parties by electronic filing on ECF.

<u>/s/ Alathea E. Porter</u>
Alathea E. Porter
Assistant U.S. Attorney
