UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 21-cr-10208-NMG |
| RESHAT ALKAYISI, *et. al*,[1] | |
| Defendants | |

## GOVERNMENT'S MOTION IN LIMINE TO ADMIT CO-CONSPIRATOR STATEMENTS

The United States of America, by the undersigned Assistant United States Attorneys, hereby moves this Court to allow statements made by the defendants' co-conspirators in evidence at trial. The government plans to offer evidence through recorded telephone calls and electronic messages intercepted pursuant to court-authorized orders, as well as testimony regarding statements made by co-defendants in the case. The statements were made by individuals who were all members of the conspiracies charged in the Superseding Indictment. The co-conspirators communicated with a cooperating witness (hereinafter, "CW"), and with each other, during and in furtherance of the conspiracies charged in the Superseding Indictment. As such, the Court should admit the statements as evidence at trial as co-conspirators' statements under Federal Rule of Evidence 801(d)(2)(E).

## FACTUAL BACKGROUND

In or about October 2020, the Federal Bureau of Investigation ("FBI") began an

---

[1] As of the date of this filing, the defendants remaining in the case are (1) Reshat Alkayisi, (4) Brian Keleman, (7) Andre Watson, (8) Emil Dzabiev, (9) Edison Klotz, (10) Patrick O'Hearn, and (11) Christina Lua. Defendant Klotz is scheduled to plead guilty on March 14, 2024.

investigation into the drug trafficking activities of James Holyoke (hereinafter, "Holyoke"). Beginning in late October 2020 and continuing through April 2021, investigators utilized a CW to complete controlled purchases of methamphetamine from Holyoke and his co-conspirators, including from Holyoke's source of methamphetamine supply, Reshat Alkayisi (hereinafter, "Alkayisi"), as well as from Edison Klotz (hereinafter, "Klotz") and Brian Keleman (hereinafter, "Keleman").   The controlled purchases from Holyoke, Alkayisi, Klotz, and Keleman, resulted in the seizure of approximately 12 pounds (more than 5 kilograms) of pure methamphetamine.   In addition to the controlled purchases, on April 3, 2021 during a car stop, investigators seized over 5 pounds (approximately 2.3 kilograms) of pure methamphetamine from co-conspirator Robyn Costa (hereinafter, "Costa"),[2] one of Alkayisi's regular drug customers, shortly after Costa obtained that methamphetamine from Alkayisi.

On May 5, 2021, the Honorable Denise J. Casper, United States District Judge, District of Massachusetts, authorized the interception of wire and electronic communications to and from a telephone used by Alkayisi (hereinafter, the "Target Telephone") for a period of thirty days.   *See* 21-91306-DJC.   Interceptions over the Target Telephone began on May 6, 2021.   On June 4, 2021, Judge Casper authorized the continued interception of wire and electronic communications to and from the Target Telephone for an additional period of thirty days.   Interceptions terminated on July 3, 2021.

During the periods of interception, investigators intercepted numerous wire and electronic communications during which Alkayisi, Keleman, Watson, Dzabiev, O'Hearn, Lua, and their co-

---

[2] Costa pleaded guilty to the Superseding Indictment on November 29, 2022 and is scheduled to be sentenced on May 14, 2024.

conspirators arranged narcotics transactions, discussed prices for narcotics, discussed collecting drug proceeds for narcotics previously supplied on credit, and discussed what to do with drug proceeds.   The investigation revealed that Alkayisi led the drug trafficking organization ("DTO"), and that he had had a number of regular methamphetamine customers, including Holyoke, Costa, and Emil Dzabiev (hereinafter, "Dzabiev"), among others.   During the investigation, Alkayisi developed new methamphetamine customers, including Watson, as well as Daneault, who had previously purchased methamphetamine from Costa.   Alkayisi also directed his criminal associate and co-conspirator Keleman package and deliver methamphetamine to customers, including Holyoke.   Alkayisi also directed Keleman and Lua what to do with drug proceeds.

Without limitation, the general categories of communications the government anticipates offering as evidence in its case-in-chief include:

1. Intercepted communications over Alkayisi's telephone, including conversations with Keleman and Lua, regarding unlawful marijuana cultivation and distribution;

2. Intercepted communications over Alkayisi's telephone with Keleman, Daneault, Watson, Dzabiev, O'Hearn, Lua, and others, regarding arranging drug deliveries, including but not limited to the following methamphetamine deliveries: Keleman's delivery of methamphetamine to Holyoke on May 6, 2021; Alkayisi delivery of methamphetamine to Daneault, O'Hearn, and another customer on May 12, 2021; Keleman's delivery of methamphetamine to Holyoke on May 19, 2021; Alkayisi's delivery of methamphetamine to Watson, Daneault, and Dzabiev on May 20, 2021; Alkayisi's delivery of methamphetamine to Watson on May 23, 2021; Keleman's delivery of methamphetamine to Holyoke on May 31, 2021; and Alkayisi's delivery

3

of methamphetamine to Daneault on June 3, 2021; as well as Keleman's planned delivery of methamphetamine to Holyoke on June 1, 2021;

3. Statements, including but not limited to intercepted communications over Alkayisi's telephone, regarding Alkayisi's regular methamphetamine customers, including Dzabiev, Costa, and O'Hearn;

4. Statements, including but not limited to intercepted communications over Alkayisi's telephone, regarding how methamphetamine customers, including Daneault, Watson, Dzabiev, O'Hearn, Holyoke, and others, paid Alkayisi for the methamphetamine he supplied;

5. Intercepted communications over Alkayisi's telephone regarding Watson connecting Alkayisi with a potential new methamphetamine customer;

6. Intercepted communications over Alkayisi's telephone, including conversations with Keleman, Tavella, Daneault, and Lua, regarding the shipment of methamphetamine, including but not limited to the tracking of packages, as well as the seizure of packages containing 100 pounds of methamphetamine from Keleman on June 1, 2021 and the seizure of a package containing 30 pounds of methamphetamine on June 25, 2021;

7. Intercepted communications over Alkayisi's telephone regarding collecting drug proceeds, as well as instructions to co-conspirators, including Keleman and Lua, regarding what to do with those drug proceeds;

8. Intercepted communications over Alkayisi's telephone regarding the arrests of co-conspirators, including but not limited to paying co-conspirator's bail and lawyer's

4

fees;

9. Intercepted communications over Alkayisi's telephone regarding firearms and ammunition, including instructions on where to hide those items from law enforcement detection;

10. Intercepted communications over Alkayisi's telephone, including with Lua, regarding Alkayisi being on probation; and

11. Intercepted communications over Alkayisi's telephone regarding his shell company, which listed O'Hearn's residence as its address.

In addition to evidence consisting of the intercepted communications themselves, the government expects to elicit testimony of cooperating witnesses and law enforcement agents regarding the content of the communications.

## <u>ARGUMENT</u>

Federal Rule of Evidence 801(d)(2)(E) provides that statements "offered against an opposing party and . . . made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay.  The First Circuit's "decision in *Petrozziello* explains that such a statement is admissible when the trial judge finds 'it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy.'"[3]  *United States v. Ruiz*, 999 F.3d 742, 748 (1st

---

[3] To be deemed "in furtherance," a statement "need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way." *United States v. Martinez-Medina*, 279 F.3d 105, 117 (1st Cir. 2002); *see also United States v. Rodriguez*, 525 F.3d 85, 101 (1st Cir. 2008) ("A statement is in furtherance of the conspiracy if it tends to advance the objects of the conspiracy as opposed to thwarting its purpose").

Cir. 2021) (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)).

      "A district court faced with a challenge to the admission of a co-conspirator's statement must provisionally admit the statement and then wait until the end of the trial to consider whether, in light of all the evidence, the following four conditions are satisfied by a preponderance of the evidence: (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; (3) the declarant was also a member of the conspiracy; and (4) the declarant's statement was made in furtherance of the conspiracy." *United States v. Diaz*, 670 F.3d 332, 348 (1st Cir. 2012). In determining the admissibility of co-conspirator statements, the Court may consider any relevant information, including the statements being offered for admission. *See Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *see also United States v. Rivera-Santiago*, 872 F.2d 1073, 1092-93 (1st Cir. 1989). "[T]he proponent of a statement must introduce some 'extrinsic evidence' of a conspiracy between the defendant and the declarant. In this context, extrinsic evidence means 'other evidence sufficient to delineate the conspiracy and corroborate the declarant's and the defendant's roles in it." *Ruiz*, 999 F.3d at 748 (quoting *United States v. Piper*, 298 F.3d 47, 52 (1st Cir. 2002)).

      Once a given defendant joins a conspiracy, the statements of their co-conspirators are admissible against them regardless of when their involvement began. *See United States v. Masse*, 816 F.2d 805, 811 (1st Cir. 1987) ("statement made by a co-conspirator . . . in furtherance of the conspiracy . . .[is] admissible against the defendant even if made prior to the defendant's involvement in the conspiracy"). As the First Circuit explained in *United States v. Baines*, "a conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight -- or conduct -- regardless of whether

he is aware of just what it is composed." 812 F.2d 41, 42 (1st Cir. 1987). The Court concluded that "verbal acts in furtherance of the conspiracy should [not] be treated differently from physical ones." *Baines*, 812 F.2d at 42.

Nor is it necessary for the government to prove that each co-conspirator knew of or had contact with all other members, or that they knew all of the details of the conspiracy or participated in every act in furtherance of it. "The [finder of fact] may infer an agreement circumstantially by evidence of, inter alia, a common purpose (such as a purpose to sell illicit drugs), overlap of participants, and interdependence of various elements in the overall plan." *United States v. Martinez-Medina*, 279 F.3d 105, 113-114 (1st Cir. 2002); *see also United States v. Marino*, 277 F.3d 11, 25 (1st Cir. 2002) ("As long as it is shown that a party, having joined a conspiracy, is aware of the conspiracy's features and general aims, statements pertaining to the details of plans to further the conspiracy can be admitted against the party even if the party does not have specific knowledge of the acts spoken of.") (internal citations omitted).

Moreover, the defendants' own statements themselves are admissible under Federal Rule of Evidence 801(d)(2)(A) as statements of an opposing party and provide sufficient extrinsic evidence to satisfy the requirements for admission of their co-conspirators' statements. *See United States v. Mitchell*, 596 F.3d 18, 24 (1st Cir. 2010) ("In any event, the government offered substantial evidence . . . to establish that [defendant] was an active conspiracy member. The government offered recordings of phone calls, which came into evidence as the defendant's own admissions, in which [defendant] discussed drug-related matters in code with other conspiracy members."). Here, the government intends to offer intercepted recorded phone calls and text messages between the defendants and other conspiracy members as described above.

7

Application of these principles here shows that the government will satisfy its initial burden under *Petrozziello* in this case and that the statements the government intends to offer are admissible.   In addition to offering the co-conspirators' statements themselves to establish "the existence of the conspiracy or participation in it," Fed. R. Evid. 801(d)(2), the government intends to offer several types of extrinsic evidence sufficient to meet the admissibility criteria.

The government intends to offer surveillance videos and photographs and/or testimony related to observing Alkayisi, Holyoke, Tavella, Keleman, Costa, Daneault, Watson, and Dzabiev and/or their respective vehicles, at times and locations consistent with the respective statements related to drug distribution, drug proceed collection, and shipment of drugs.   Further, individuals identified in the discovery as CW-3 and CW-4 will testify that they routinely purchased methamphetamine from Alkayisi, and CW-3 will testify that on multiple occasions Keleman delivered methamphetamine to CW-3 on behalf of Alkayisi.   Additionally, the individual identified in the discovery as CW-5 will testify about the shipment of large quantities of methamphetamine to Alkayisi, as well as the transfer of drug proceeds through the mail and shipping companies.

The government's evidence will show that, between at least March 2020 through July 2021, defendants Alkayisi, Keleman, Watson, Dzabiev, Klotz, and O'Hearn were engaged in drug trafficking, along with the other co-conspirators charged in Count One of the Superseding Indictment.   Specifically, Alkayisi negotiated drug deals, delivered drugs, picked up money, stored and processed drugs, and directed others to do so on his behalf, including Keleman.   In furtherance of these activities, the defendants engaged in transactions that were first set up through wire communications, followed by physical meetings, which were surveilled by law enforcement,

and some of which will be corroborated through testimony of cooperating witnesses who participated in those deals.

For example, on May 20, 2021, through wire communications, Alkayisi made arrangements to deliver methamphetamine to multiple customers, including Dzabiev, Daneault, and Watson.   Law enforcement conducting surveillance observed Alkayisi deliver approximately one pound (455 grams) of pure methamphetamine to Dzabiev, and following the meeting law enforcement seized the methamphetamine from Dzabiev.   As another example, on June 1, 2021, through wire communications Alkayisi directed Keleman to pick up boxes at UPS so that Keleman could deliver eight pounds (3.6 kilograms) of methamphetamine to Holyoke.   Law enforcement surveilled Keleman retrieve the boxes, intercepted communications between Alkayisi and Keleman regarding the contents of the boxes, and then law enforcement seized the boxes, which contained approximately 100 pounds (45 kilograms) of pure methamphetamine.   Following that seizure, Alkayisi engaged in multiple wire communications with co-conspirators regarding the seizure and the need to hide his firearms.   The government intends to introduce evidence of both of these seizures at trial, including wire communications, testimony, surveillance video, and the seized drugs themselves.

Similarly, the evidence will establish that Alkayisi, Tavella, Keleman, O'Hearn, and Lua were members of a conspiracy to launder drug proceeds, as charged in Count Twelve of the Superseding Indictment.   Alkayisi paid the bail for two of his methamphetamine customers, including Costa, and he paid for a lawyer for Keleman following the 100 pound seizure.   Alkayisi also maintained a shell corporation, which used O'Hearn's residential address as the address for the fake company that he used to launder his drug proceeds.   O'Hearn routinely paid Alkayisi for

methamphetamine using peer-to-peer payments, as did other customers, including Watson, and Dzabiev. Alkayisi shipped bulk currency through the mail, and he transported bulk currency from Massachusetts to California. All of these actions were done in order to conceal and disguise the nature, location, source, ownership, and control of the drug proceeds. Additionally, at the direction of Alkayisi, both Keleman and Lua made bank deposits in quantities less than $10,000 both to conceal and disguise the drug proceeds and to avoid transaction reporting requirements. The evidence will also show that O'Hearn utilized safe deposit boxes to conceal his drug proceeds.

The government intends to introduce wire communications and testimony regarding co-conspirator statements related to these transactions. The government will also introduce shipping records, bank records, other business records, as well as witness testimony. That testimony will include the testimony of CW-4, for whom Alkayisi paid their bail, as well as testimony from CW-5, who received shipments of bulk currency from Alkayisi.

The conspirators were acting – and communicating – on behalf of the conspiracies on a daily basis. All of those statements in furtherance of the conspiracies are admissible as co-conspirator statements. The examples above are not the only statements that the government will offer at trial; instead, they are representative examples of the types of co-conspirator statements that will be introduced in evidence.

## **CONCLUSION**

Based on the foregoing, the government submits that its anticipated trial testimony, including the recorded statements of the defendants and their co-conspirators, is more than sufficient to establish by a preponderance of the evidence that the defendants in this case were co-co-conspirators as charged in the Superseding Indictment. The government therefore requests

that the Court admit against the defendants at trial the statements made during this period and in

furtherance of this conspiracy.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:  /s/ Alathea E. Porter
ALATHEA E. PORTER
KATHERINE FERGUSON
Assistant United States Attorneys

Date: February 20, 2024

## CERTIFICATE OF SERVICE

I hereby certify that I am filing this document via the ECF system, which will cause
copies to be sent by electronic mail to defendants' attorneys of record.

By:    /s/ Alathea E. Porter
ALATHEA E. PORTER

Dated: February 20, 2024