UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cr. No. 21-10208-NMGss |
| ) | |
| (4) BRIAN KELEMAN, ) | |
| Defendant ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Untied States of America, by and through Assistant United States Attorney Alathea E. Porter, hereby respectfully submits this sentencing memorandum in connection with the sentencing of defendant Brian Keleman (hereinafter, the "Defendant"). Pursuant to a binding plea agreement (Dkt. 508), on June 20, 2024, the Defendant waived Indictment and pled guilty to Counts One and Three of a four-count Second Superseding Indictment, charging Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846 (Count One), and Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Three).

As set forth herein, and for the reasons to be stated at the sentencing hearing, the government recommends that the Court sentence the Defendant to 60 months of imprisonment, followed by 36 months of supervised release, a $200 special assessment, and forfeiture as alleged in the Second Superseding Indictment.

### Background of the Case

The background of the case is set forth in detail in the final Pre-Sentence Report ("PSR"), prepared by the United States Probation Office ("Probation"), and is therefore not fully restated herein. PSR, ¶¶ 10-48. In summary, this case involves a conspiracy among large-scale methamphetamine distributors in the New England area. *Id.* The investigation began when a

cooperating witness ("CW") provided investigators with information about James Holyoke ("Holyoke"), a large-scale methamphetamine distributor. PSR, ¶ 10.

Over the course of the investigation, the CW participated in twelve successful controlled purchases of methamphetamine from the drug trafficking organization. PSR, ¶ 11. Eleven of the controlled purchases were arranged by Holyoke, and he personally delivered the methamphetamine for eight of those eleven deals. *Id.* One of the controlled purchases was arranged by Holyoke, but delivered by Holyoke's associate Edison Klotz. *Id.* Two of the other controlled purchases were arranged by Holyoke, but delivered by Holyoke's methamphetamine supplier Reshat Alkayisi ("Alkayisi"). *Id.* Additionally, Alkayisi arranged one controlled with the CW, but had the Defendant deliver the methamphetamine to the CW. PSR, ¶¶ 12-17. Specifically, on April 15, 2021, the Defendant met with the CW in the parking lot of a shopping center and provided the CW with three pounds (or 1.337 kilograms) of pure methamphetamine. PSR, ¶¶ 13-17.

Beginning in May 2021, pursuant to Title III wiretap orders, investigators intercepted communications to and from Alkayisi's telephone for a total of sixty days. PSR, ¶ 18. In addition to his methamphetamine trafficking, the interceptions revealed that Alkayisi also operated a large-scale illegal marijuana grow operation at his residence in Rhode Island, and that the Defendant worked on Alkayisi's marijuana grow operation. PSR, ¶¶ 19, 21-25.

During the sixty days of interceptions, Alkayisi regularly traveled outside of New England to California and Las Vegas, Nevada. PSR, ¶ 19. Just prior to leaving on those trips, as well as upon his return, investigators intercepted multiple communications related to Alkayisi supplying his distributors with methamphetamine. *Id.* In addition, while traveling or otherwise available, Alkayisi directed the Defendant to deliver methamphetamine on his behalf to distributor

customers, including to Holyoke. *Id.* As set forth in detail in the PSR, based on interceptions and surveillance, the Defendant delivered methamphetamine to Holyoke on at least three occasions in May 2021, and planned to deliver additional methamphetamine to Holyoke on a fourth occasion in June 2021. PSR, ¶¶ 26-33. In the month of May 2021 alone, the Defendant delivered over 18 pounds (or 8.1 kilograms) of methamphetamine to Holyoke on behalf of Alkayisi. PSR, ¶¶ 27-32.

On June 1, 2021, Alkayisi directed the Defendant to retrieve packages at UPS so that the Defendant could deliver another 8 pounds (or 3.6 kilograms) of methamphetamine to Holyoke. PSR, ¶ 33. Investigators observed the Defendant retrieve four boxes from UPS, and thereafter they conducted a motor vehicle stop during which they seized approximately 100 pounds (over 44 kilograms) of 100% pure methamphetamine. PSR, ¶¶ 34-35.

In the course of delivering methamphetamine on behalf of Alkayisi, the Defendant also collected drug proceeds on behalf of Alkayisi and deposited those proceeds into Alkayisi's bank account. PSR, ¶ 48. At the direction of Alkayisi, the Defendant deposited drug proceeds in a manner designed to conceal the unlawful nature of the funds. On May 29, 2021, Alkayisi directed the Defendant to deposit cash he collected from a methamphetamine customer. *Id.* Alkayisi told the Defendant not to deposit "the whole thing" ($10,000), but to "take eight. Eight thousand" so that he could avoid reporting requirements. *Id.*

## Sentencing Guidelines

The final PSR determined that Defendant's total offense level is 27. PSR, ¶ 65. The Defendant's base offense level of 34. PSR, ¶ 55. Since the Defendant is accountable for over 53 kilograms of pure methamphetamine, the base offense level starts at level 38, however, because he received an adjustment under § 3B1.2, the base offense level is decreased by 4 levels, resulting in a base offense level of 34. *Id.* Probation then reduced the Defendant's offense level by 2 levels,

pursuant to USSG § 5C1.2 and § 2D1.1(b)(18). PSR, ¶ 56. Probation further reduced the Defendant's offense level by 2 levels, pursuant to USSG § 3B1.2(b), finding that the Defendant was a minor participant in the criminal activity. PSR, ¶ 59. Probation also reduced the offense level by 3 levels based on the Defendant's acceptance of responsibility. PSR, ¶¶ 62-63. Probation also determined that the Defendant has zero criminal history points, and thus, he received an additional 2 level reduction pursuant to USSG § 4C1.1. PSR, ¶ 64. As the Defendant falls into criminal history category I, and has a total offense level of 27, Probation concluded that the Defendant's advisory sentencing guideline range is 70-87 months. PSR, ¶ 104. The government agrees with these calculations.

## Consideration of the Section 3553(a) Factors

Taking into account the Defendant's role in the offense, his personal history and characteristics, as well as the nature of the offense, and considering the factors set forth in 18 U.S.C. § 3553(a), the Government respectfully suggests that a sentence of 60 months is sufficient, but not greater than necessary, to comply with the purposes of set forth in 18 U.S.C. § 3553(a).

1. **Nature of the Offense**

The Defendant was a member of a DTO responsible for distributing massive amounts of methamphetamine in the New England area. Methamphetamine is a deadly and highly addictive drug that is an increasingly serious problem throughout the United States and in the District of Massachusetts.[1] The proportion of federal drug trafficking cases involving methamphetamine has steadily increased over the past 20 years, accounting for 48.7% of all of drug trafficking cases in

---

[1] Martha Bebinger, *"Meth Use Is Rising In Boston, Intensifying The Opioid Crisis,"* appearing at https://www.wbur.org/news/2018/11/21/meth-worsening-opioid-epidemic (last accessed June 24, 2024).

2022, and becoming the predominant drug trafficked over the last decade.[2] Abuse of this potent stimulant is plaguing many parts of the country, and the government has seen a significant rise in the amount of methamphetamine in the District of Massachusetts over the course of the last three years.

Recent national reports have confirmed that methamphetamine abuse is increasing dramatically. The National Institute on Drug Abuse found that among people aged 12 or older in 2021, 0.9% (or about 2.5 million people) reported using methamphetamine within the prior 12 months.[3] And that reflects only those who *reported* use. Moreover, methamphetamine is one of the most commonly misused stimulant drugs in the world.[4] "The consequences of methamphetamine misuse are terrible for the individual—psychologically, medically, and socially. Using the drug can cause memory loss, aggression, psychotic behavior, damage to the cardiovascular system, malnutrition, and severe dental problems."[5] In addition to these horrific effects on individual health, "methamphetamine misuse threatens whole communities, causing new waves of crime, unemployment, child neglect or abuse, and other social ills."[6]

---

[2] United States Sentencing Commission, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System,* appearing at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2024/202406_Methamphetamine.pdf, at 16 (last viewed August 6, 2024) ("USSC 2024 Methamphetamine Trafficking Offenses")

[3] *See* NIDA. "Overview." *National Institute on Drug Abuse*, 24 Feb. 2023, https://nida.nih.gov/publications/research-reports/methamphetamine/overview (last accessed June 24, 2024).

[4] *Id.*

[5] *Id.*

[6] *Id.*

Among people aged 12 and older in 2020, an estimated 0.6% (or about 1.5 million people) had a methamphetamine use disorder in the prior 12 months.[7] Methamphetamine is second only to fentanyl in causing drug-related deaths in the United States.[8] In 2022, there were 33,355 methamphetamine-related deaths nationwide.[9] Indeed, this crisis has worsened each year since 2015.[10] The Centers for Disease Control and Prevention found that overdose deaths from psychostimulants, comprised mostly of methamphetamine, increased by 703% from 2011 to 2021.[11] Moreover, the Drug Enforcement Administration found that 31% of drug-related deaths in the United States are caused by psychostimulants – mostly methamphetamine.[12] As of June 2, 2024, there were at 34,595 methamphetamine-related deaths nationwide for the prior 12-month period.[13]

Equally devastating, as methamphetamine production has shifted from makeshift, local labs to sophisticated Mexican laboratories, methamphetamine production and purity have

---

[7] *Id.*

[8] Drug Enforcement Administration, *2024 National Drug Threat Assessment*, appearing at https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf, at 3 (last viewed August 6, 2024) ("DEA 2024 Assessment").

[9] National Center for Health Statistics, *VSRR Provisional Drug Overdose Death Counts*, appearing at https://data.cdc.gov/d/xkb8-kh2a (hereinafter, "2022 VSRR Overdose Death Counts") (last accessed Dec. 9, 2023).

[10] *Id.*

[11] USSC 2024 Methamphetamine Trafficking Offenses, at 6.

[12] DEA 2024 Assessment, at 6.

[13] National Center for Health Statistics, *National Vital Statistics System, Provisional Drug Overdose Death Counts,* appearing at https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last accessed June 24, 2024) (hereinafter, "2024 VSRR Overdose Death Counts").

increased exponentially.[14] Purity of methamphetamine has risen to nearly 100%. Indeed, in this case, investigators seized over 60.8 kilograms of 100% pure methamphetamine. As the New York Times has reported, this combination of increased production and increased purity has been particularly lethal: "There is more meth on the streets today, more people are using it, and more of them are dying."[15]

In recent years, methamphetamine has become much more prevalent in the Northeast.[16] Most of the methamphetamine supply is produced in Mexico and transported to the United States.[17] That is because methamphetamine produced in Mexico presents a lower cost, higher purity, and higher potency alternative.[18] Due to its low costs of production and maintenance, combined with the expansion of Mexican drug cartels into major United States cities and their extensive drug distribution networks within local communities, methamphetamine remains in constant supply and is easily accessible.[19] Purer, cheaper methamphetamine leads to more deaths. The number of

---

[14] Frances Robles, "*Meth, the Forgotten Killer, is Back. And It's Everywhere*", The New York Times, February 13, 2018, appearing at https://www.nytimes.com/2018/02/13/us/meth-crystal-drug.html (hereinafter, "Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere*") (last accessed June 24, 2024).

[15] Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere.*

[16] U.S. Department of Justice Drug Enforcement Administration, *2020 National Drug Threat Assessment*, available at https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf, at 23 (last accessed June 24, 2024) (hereinafter, "DEA 2020 Assessment"); Streck, Joanna M et al., *Injection of Methamphetamine Has Increased in Boston, Massachusetts: 5 Waves of Centers for Disease Control and Prevention State Surveillance Data*, 17.3 J. OF ADDICTION MEDICINE 349–352 (2023) (last viewed July 12, 2023).

[17] DEA 2024 Assessment, at 31.

[18] *Id.*

[19] *Id.* at 3 – 16.

methamphetamine overdoses in Massachusetts alone increased threefold from 2018 to 2022 (growing from 70 deaths to 210).[20] Between June 2023 and June 2024, there were 215 methamphetamine-related overdose deaths in Massachusetts.[21] In fact, "[t]he rate of all drug-related E[mergency] D[epartment] visits was highe[r] among patients residing in the Northeast[ern United States] (2,531 per 100,000 [residents])" than any other region in the nation.[22]

Even when not lethal, the physical and emotional effects of methamphetamine abuse are dramatic. Methamphetamine has a horrific impact on its users and on the community. Methamphetamine is a tremendously addictive drug, which can cause dramatic physical and emotional changes on those who use it, including increases in aggressive and violent behavior.[23] The physical effects on users are well-documented. The emotional changes are equally devastating:

> Chronic abusers may exhibit symptoms that can include significant anxiety, confusion, insomnia, mood disturbances, and violent behavior. They also may display a number of psychotic features, including paranoia, visual and auditory hallucinations, and delusions (for example, the sensation of insects creeping under the skin). Psychotic symptoms can sometimes last for months or years

---

[20] 2022 VSRR Overdose Death Counts.

[21] 2024 VSRR Overdose Death Counts.

[22] Substance Abuse and Mental Health Services Administration, PEP22-07-03-002, *Findings from Drug-Related Emergency Department Visits, 2021*, https://store.samhsa.gov/sites/default/files/pep22-07-03-002.pdf (2022), at 9 (last accessed June 24, 2024).

[23] Mark A. R. Kleiman, Jonathan P. Caulkins, and Angela Hawken, *Drugs and Drug Policy: What Everyone Needs to Know* 120 (Oxford University Press 2011) ("There is . . . a much stronger association between violence and regular methamphetamine use. Heavy use of methamphetamine increases the likelihood of attack behaviors and aggression, with the most compelling evidence coming from laboratory studies involving mice.").

after a person has quit abusing methamphetamine, and stress has been shown to precipitate spontaneous recurrence of methamphetamine psychosis in formerly psychotic methamphetamine abusers.[24]

And, unlike opioid addiction, there are no approved drugs available for treatment of methamphetamine addiction.[25] Addicted users who choose to stop using methamphetamine may face withdrawal symptoms including severe depression, psychosis, and intense drug cravings.[26] Even methamphetamine addicts who manage to overcome their addiction "will be at risk for relapse for years and possibly for their whole lives."[27]

### 2. Characteristics of the Defendant

The Defendant is a 55 year old man, who suffers from multiple medical issues. PSR, ¶¶ 82, 87-88. While the Defendant has a college degree, it does not appear that he has maintained lawful employment for most of his adult life. PSR, ¶¶ 95-97. As detailed in the PSR, the Defendant experienced a traumatic childhood. PSR, ¶¶ 82-83. The Defendant does not appear to have any close family. PSR, ¶¶ 82-85. As the investigation revealed, Alkayisi took advantage of the

---

[24] National Institute on Drug Abuse, *What are the long-term effects of methamphetamine abuse,* April 7, 2017, appearing at https://www.drugabuse.gov/publications/research-reports/methamphetamine/what-are-long-term-effects-methamphetamine-abuse (last accessed June 24, 2024).

[25] Carmen Heredia Rodriguez, *"Meth's Resurgence Spotlights Lack of Meds To Combat the Addiction,"* Kaiser Health News, January 14, 2019, appearing at https://khn.org/news/meths-resurgence-spotlights-lack-of-meds-to-combat-the-addiction/ (last viewed June 24, 2024).

[26] National Institute on Drug Abuse, *Methamphetamine Drug Facts*, May 16, 2019, appearing at https://nida.nih.gov/publications/drugfacts/methamphetamine (last accessed June 24, 2024).

[27] National Institute on Drug Abuse, *Understanding Drug Use and Addiction DrugFacts*, June 6, 2018, appearing at https://nida.nih.gov/publications/drugfacts/understanding-drug-use-addiction (last accessed June 24, 2024).

Defendant and directed his unlawful actions. While the Defendant was certainly a knowing and voluntary participant in these criminal conspiracies, he was acting at all times under the supervision and at the direction of Alkayisi. These factors support the joint recommendation of 60 months imprisonment, which is a downward variance from the low-end of the advisory guideline sentencing range.

### 3. Need for the Sentence Imposed

As the discussion above regarding the nature of the offense makes clear, there is a compelling need to deter individuals who may be inclined to participate in drug trafficking — particularly substances as dangerous as methamphetamine. A significant sentence of imprisonment is warranted to deter individuals from engaging in trafficking of methamphetamine, as the dangers associated with that conduct cannot be overstated. Individuals tempted to engage in drug trafficking must understand that *any* involvement with methamphetamine will have immediate and harsh consequences. Imprisonment is necessary to send a strong warning to others who might otherwise consider involvement with this dangerous drug that they must resist the temptation.

The evidence suggests that the Defendant's participation in drug trafficking and money laundering was entirely at the direction and under the supervision of Alkayisi. It is further apparent that the Defendant's participation in the charged conspiracies was limited. While the nature of these offenses is very serious, the Defendant's limited role and his personal history and characteristics, including his significant health issues, are factors that support the parties joint sentencing recommendation. The sentence recommended by the parties will hopefully be sufficient to deter others who might otherwise engage in this extremely harmful criminal conduct, and it is also necessary to promote respect for the law and to provide just punishment for the

offense.

## CONCLUSION

For the reasons set forth herein, and as will be addressed at the sentencing hearing, the government recommends that the Court accept the plea agreement and sentence the Defendant to 60 months of prison, three years of supervised release, and a mandatory special assessment of $200.

Dated: September 9, 2024

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:     */s/ Alathea E. Porter*
ALATHEA E. PORTER
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 9, 2024.

*/s/ Alathea E. Porter*
ALATHEA E. PORTER
Assistant U.S. Attorney