```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3    UNITED STATES OF AMERICA,            )
                                           )
 4                    Plaintiff            )
                                           )  No. 1:21-cr-10208-NMG-10
 5    vs.                                  )
                                           )
 6    PATRICK O'HEARN,                     )
                                           )
 7                    Defendant.           )
                                           )
 8                                         )
                                           )
 9

10

11          BEFORE THE HONORABLE NATHANIEL M. GORTON
                  UNITED STATES DISTRICT JUDGE
12                       Sentencing

13

14

15

          John Joseph Moakley United States Courthouse
16                     Courtroom No. 4
                      One Courthouse Way
17               Boston, Massachusetts 02210

18

                       October 25, 2024
19                        2:17 p.m.

20

21

               Kristin M. Kelley, RPR, CRR
22                 Official Court Reporter
          John Joseph Moakley United States Courthouse
23             One Courthouse Way, Room 3209
               Boston, Massachusetts 02210
24              E-mail: kmob929@gmail.com

25        Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2

 3            Katherine H. Ferguson
              United States Attorney's Office MA
 4            1 Courthouse Way
              Suite 9200
 5            Boston, MA 02210
              617-748-3555
 6            katherine.ferguson@usdoj.gov
              for Plaintiff.
 7

 8
              John L. Calcagni, III
 9            Law Offices of John L. Calcagni III
              72 Clifford Street
10            Suite 300
              Providence, RI 02903
11            401-351-5100
              Jc@calcagnilaw.com
12            for Defendant.

13

14            Kensley Barrett
              Marin & Barrett, Inc.
15            1000 Chapel View Blvd
              Suite 260
16            Cranston, RI 02920
              401-380-6724
17            Kb@marinbarrettmurphy.com
              for the Defendant.
18

19

20

21

22

23

24

25
```

|  | 1 | P R O C E E D I N G S |
|--|---|--|

1     P R O C E E D I N G S

2    THE CLERK:  All rise.

3    (The Honorable Court entered.)

4    THE CLERK:  Thank you.  You may be seated.  This is

02:19 5 Criminal Action No. 21-10208, the United States of America

6 versus Patrick O'Hearn.

7    Would counsel please introduce themselves for the

8 record.

9    MS. FERGUSON:  Good afternoon, your Honor.  Kate

02:19 10 Ferguson on behalf of the government.

11    THE COURT:  Miss Ferguson, good afternoon.

12    MR. BARRETT:  Good morning, Patrick Barrett on behalf

13 of Mr. O'Hearn.

14    THE COURT:  Mr. Barrett.

02:19 15    MR. CALCAGNI:  Good afternoon, your Honor.  John

16 Calcagni, also on behalf of Patrick O'Hearn.

17    THE COURT:  Mr. Calcagni and Mr. O'Hearn, good

18 afternoon.

19    THE DEFENDANT:  Good afternoon, your Honor.

02:19 20    THE COURT:  We have Miss Patten from Probation here as

21 well.

22    Please be seated.  We're here on the sentencing of

23 Mr. Patrick O'Hearn.  I have received and read the presentence

24 report, government's Sentencing Memorandum, the defendant's

02:20 25 Sentencing Memorandum and a group of attachments to that

memorandum.  I guess there are six in all.  Attachment A is

evidence of the defendant's drug treatment.  Attachment B is

certificates of completion of certain courses at the Wyatt

institution.  I believe there are 12 in all.  Attachment C is a

02:20  diploma and resume of the defendant.  Attachment D is three

letters in support of the defendant from his sister, a niece,

and a longtime friend.  Attachment E is a letter from the

defendant himself with respect to Restorative Justice, and

Attachment F are certain photographs.  Also, I've received the

02:21  defendant's supplemental Sentencing Memorandum.

Those are all the writings I have received.  Is there

anything I haven't mentioned that I should have received?

Miss Ferguson?

MS. FERGUSON:  The only thing was a notice regarding

02:21  forfeiture that was filed some time ago in February of this

year.  It does pertain --

THE COURT:  Yes.  I did, in fact, receive that.  That

was docket 451, but it was submitted back in February, right?

MS. FERGUSON:  Yes, yes, correct.

02:21  THE COURT:  It was notice to the Court regarding the

fact that the items had already been forwarded to the FBI?

MS. FERGUSON:  Yes, correct, your Honor.

THE COURT:  Anything else?

MS. FERGUSON:  No, your Honor, not to the government's

02:21  knowledge.

|  | 1 | THE COURT:  Mr. Calcagni or is it Mr. Barrett? |
|---|---|---|

         1              THE COURT:  Mr. Calcagni or is it Mr. Barrett?

         2              MR. CALCAGNI:  Nothing additional, your Honor.

         3              THE COURT:  All right.

         4              Then, as I understand it, Mr. Calcagni and

02:21    5    Miss Ferguson, there were no objections to the presentence

         6    report, is that correct?

         7              MS. FERGUSON:  That is correct, your Honor.

         8              MR. CALCAGNI:  That's right, your Honor.  We thought

         9    we may have made an objection to the career offender status,

02:22   10    but upon closely analyzing that, there are no objections from

        11    the defense.

        12              THE COURT:  All right.  Thank you.

        13              Then we need to turn to the part of the presentence

        14    report that deals with the establishment of the guidelines.

02:22   15    That starts on page 11 of the presentence report, wherein I am

        16    advised that it is the 2023 Guideline Manual that will apply in

        17    this case.

        18              There are two separate counts, one for drug

        19    trafficking and the other for money laundering.  When that

02:22   20    happens, the process is that we have to consider the count that

        21    is the most serious comprising the group in determining the

        22    calculation.  In this case, it's the money laundering rather

        23    than the drug trafficking.

        24              So we start with guideline Section 2S1.1, the money

02:23   25    laundering guideline.  That, in turn, refers us back to the

1    drug trafficking guideline, 2D1.1, to establish a base offense

2    level.  In this case, the defendant is held accountable for

3    35 kilograms of actual methamphetamine, so the base offense

4    level is 38 pursuant to 2S1.1(a)(1), 2D1.1(a)(5) and (c)(1) of

02:23 5    that same guideline section, 38.

6            Do counsel agree with that calculation?

7    Miss Ferguson?

8            MS. FERGUSON:  Yes, your Honor.

9            THE COURT:  Mr. Calcagni?

02:23 10           MR. CALCAGNI:  Yes, your Honor.

11           THE COURT:  The Court so finds.

12           Then, also, because the defendant was convicted under

13   Title 18 of the United States Code Section 1956, his offense

14   level is increased by two levels pursuant to 2S1.1(b)(2)(B).

02:23 15   That yields an adjusted offense level of 40.

16           The defendant has been established as a career

17   offender because he is at least 18 years old.  The instant

18   offense was a conviction of a felony for a controlled substance

19   offense.  The defendant has at least two prior felony

02:24 20   convictions for controlled substance offenses.  However, the

21   otherwise applicable offense level determined under Chapters 2

22   and 3 is greater, so the fact that he's a career offender has

23   no impact on this calculation pursuant to guideline 4B1.1(a).

24   He then, therefore, has an adjusted offense level of 40.

02:24 25           Do counsel agree with that calculation?

```
 1    Miss Ferguson?
 2              MS. FERGUSON:  Yes, your Honor.
 3              THE COURT:  Mr. Calcagni?
 4              MR. CALCAGNI:  Yes, your Honor.
 5              THE COURT:  The Court so finds.
 6              The defendant is entitled to a three-level downward
 7    adjustment for his acceptance of responsibility, therefore ends
 8    up with a total offense level of 37.
 9              Turning to his criminal history, he has two scored
10    prior criminal convictions:  One in 2006 for methamphetamine
11    trafficking, which he gets three criminal history points for;
12    another in 2008 for a second methamphetamine trafficking
13    offense for which he gets three additional criminal history
14    points.  That's a total of six, which otherwise would give him
15    category, Criminal History Category III, but because he is a
16    career offender, he ends up in Criminal History Category VI,
17    where the guideline range is 360 months to life.
18              Do counsel agree with those calculations?
19    Miss Ferguson?
20              MS. FERGUSON:  Yes, your Honor.
21              THE COURT:  Mr. Calcagni?
22              MR. CALCAGNI:  Yes, your Honor.
23              THE COURT:  The Court so finds.
24              I will now hear recommendations for sentencing,
25    starting with the government.
```

1            Miss Ferguson.

2            MS. FERGUSON:  Thank you, your Honor.

3            The government is recommending a sentence of

4    198 months incarceration, to be followed by 3 years of

02:26  5    supervised release.  I recognize there was a discrepancy in one

6    part of the government's Sentencing Memorandum, but it is the

7    198-month recommendation that we are making to the Court.  And

8    as alluded to a minute ago, the items in the previous

9    indictment has been previously forfeited, so forfeiture is not

02:26 10    an issue at this time.

11            The reasons for the government's recommendation are

12    several, your Honor.  First, and very significantly, are the

13    nature and circumstances of the offense.  As the Court knows

14    very well having received pleas of guilty from many defendants

02:27 15    now in this case and having sentenced most of the defendants in

16    this case at this time, the scale of the methamphetamine

17    conspiracy is staggering.  At the time of this investigation,

18    we had never before seen quantities of methamphetamine like

19    this in New England, and this organization really was on the

02:27 20    leading edge of the broader introduction of methamphetamine

21    into the region.

22            Mr. O'Hearn himself purchased and distributed an

23    incredible amount of methamphetamine over a relatively short

24    period of time.  He's held accountable today for 70 some odd

02:27 25    pounds of pure methamphetamine.  That's an incredible amount of

1   methamphetamine.  It's indicative of a long-term and

2   well-established distribution operation.

3          As the Court well knows, methamphetamine is a horrific

4   drug.  It destroys the lives of users.  It destroys the lives

02:28   5   of the people around them, as the users become so easily

6   addicted to the drug.  It destroys the lives of their families.

7   It destroys the lives of the broader community around them.

8   Methamphetamine doesn't kill as quickly as Fentanyl does and,

9   perversely, for that reason, it inflicts a different kind of

02:28  10   long-term damage and chaos.  The crimes committed by Mr.

11   O'Hearn could hardly be more serious, your Honor, and they're

12   deserving of a very significant sentence.

13          That said, as is so often the case in these

14   methamphetamine prosecutions, there is an element of tragedy

02:28  15   here.  That weighs in favor of some mitigation.  Mr. O'Hearn

16   came from a stable family, a good, pretty solid upbringing.  He

17   is educated.  For 20 years, he worked successfully in a

18   professional career, but at a certain point, he lost his

19   parents, he lost his brother, he struggled with certain

02:29  20   elements of his life.  His home life began to dissemble and he

21   turned to drugs.

22          As is common, he quickly became addicted to

23   methamphetamine and he began distributing to support his habit.

24   We see it time and time again in methamphetamine cases, your

02:29  25   Honor.  The addiction leads to the distribution.  Mr. O'Hearn

1    bears responsibility.  There is no question, and he as

2    acknowledged that, but there's also no question that his drug

3    addiction is a major factor in his criminality.

4         Indeed, even during the periods when he was

02:29  5    distributing drugs, Mr. O'Hearn continued to work in legitimate

6    jobs and he even worked in jobs paying really meager wages,

7    particularly when they're compared to the type of career that

8    he did have for a significant period of time earlier in his

9    life, and that bears mentioning and recognition.  And that does

02:30 10    say something about him and it speaks also to the motivation

11    for his offenses here.

12         It's primarily for that reason because of the fact

13    that his own drug addiction was, in the government's view, an

14    animating factor in his drug distribution and his money

02:30 15    laundering offenses that the government is recommending a below

16    guideline sentence here today.

17         The government is also recommending a below guideline

18    sentence for proportionality reasons, your Honor.  Co-defendant

19    Reshat Alkayisi received a sentence of 276 months.  Mr. O'Hearn

02:30 20    is certainly less culpable than Alkayisi and significantly so.

21    Alkayisi was not an addict.  He was motivated solely by greed.

22    He was manipulative.  He was abusive to those around him in a

23    way that Mr. O'Hearn was not.  So it is the government's view

24    that Mr. O'Hearn's sentence should be shorter than that

02:31 25    received by Alkayisi.  It's the government's view that it

should be shorter by a significant amount, and so it's also for
that reason that the government is recommending a sentence
today that is significantly below the guidelines, the low end
of the guidelines.

At the same time, your Honor, Mr. O'Hearn is not a
first time offender.  He's not a second time offender either.
That certainly cuts the other way.  This isn't his first
methamphetamine trafficking conviction.  It's not his second
methamphetamine trafficking conviction.  Even if he were not a
career offender here today, his guideline sentencing range
would be 262 to 327 months.  It would still be very high.  His
natural guidelines are very, very high.

Mr. O'Hearn has been given a second chance and he's
been given a third chance and here we are again.  Even after he
was arrested in this case, Mr. O'Hearn continued to use drugs.
He was released, as the Court knows.  He was released on
pretrial conditions and he continued to use drugs and,
ultimately, was taken into custody again and was detained.  It
is hard to escape the throws of addiction.  This is true, but
at a certain point, there has to be a reason to try harder and
incarceration is a factor that weighs in that calculus.

Incarceration, too, is a period of forced sobriety.
And when it's a longer period, coupled with intensive
treatment, like one can receive in the RDAP, hopefully there's
a greater chance that that's going to stick.

1          So the sentence recommended by the defendant, which is

2     only a year longer than he previously served on his two prior

3     methamphetamine convictions, it's the government's view that

4     that sentence does not adequately reflect the longevity or

02:32 5     scale of Mr. O'Hearn's criminality and that really is unlikely

6     to adequately punish him for his crimes here and also that it's

7     unlikely to serve as an adequate deterrent to future criminal

8     activity, whereas the prior 90-month sentence did not do so,

9     even at 60 years of age.  Mr. O'Hearn certainly at this point

02:33 10    is old enough to have known better and to have done better, and

11    yet here we are.

12          So it is for these reasons, your Honor, that the

13    government is recommending a 198-month sentence.  It is a

14    sentence that is sufficient, but not greater than necessary.

02:33 15    It's a sentence that will serve the purposes set forth in

16    Section 3553.  It will punish Mr. O'Hearn for his crimes.  It

17    will promote respect for the rule of law.  It will send a

18    message of deterrence both to Mr. O'Hearn and to the public at

19    large.

02:33 20          Thank you.

21          THE COURT:  Thank you, Miss Ferguson.

22          Mr. Calcagni.

23          MR. CALCAGNI:  Thank you, your Honor.

24          Your Honor, as I begin my remarks today, I want to

02:33 25    make it known that the defense will in no way make any effort

to justify or minimize the severity of my client's misconduct
or the impact that the drugs that he trafficked on the
community.

I also want to acknowledge for the Court the
reasonableness of the government's sentencing recommendation in
the sense that it's considerably below the guideline range that
he would have been exposed to had he not otherwise qualified as
the career offender enhancement.

When determining the appropriate punishment here
today, I hope the Court will be mindful of the fact that
imposing the sentence advocated by the government may
ultimately become a life sentence for this particular
defendant.

As a defense attorney when I view the facts and
circumstances of this case and of this client, it strikes me
that it's a bit of an anomaly.  The Court is most often dealing
with much younger offenders involved in drug trafficking,
people that didn't come from decent home life, decent
backgrounds, individuals without education or significant job
opportunity.  And the truth be told is, Mr. O'Hearn had all of
that and more, and I think the presentence report makes that
quite clear.

Mr. O'Hearn grew up in Massachusetts in a loving and
encouraging Roman Catholic conservative household.  He's joined
by his sister Lynne his and brother-in-law who are sitting in

1    the audience.  Mr. O'Hearn was once married, raised children.

2    He was educated at Bentley College.  As my sister just

3    acknowledged, had a pretty illustrious career working in

4    finance in corporate America.

02:35  5          But the backdrop here, which perhaps is the elephant

6    in the room and maybe some folks might think it would be

7    politically incorrect to speak, is that my client's gay.  He

8    was born a homosexual in a conservative home where he didn't

9    have the courage to come out and tell people who he was and who

02:35 10   he wanted to be because he grew up in a time where people who

11   did that were ostracized.  So he followed the plan that his

12   parents had laid out in front of him.  He went to high school,

13   went to college.  He got married and he started to raise a

14   family.

02:36 15          Predictably, that family life ultimately failed when

16   he involved himself in a relationship that perhaps he was never

17   meant to be in in the first place.  Mr. O'Hearn divorced in

18   1999.  It was around that time that he also lost the relatives

19   that my sister just mentioned and, low and behold, four years

02:36 20   later after deciding to pursue a homosexual lifestyle and

21   perhaps making some poor choices in connection with it, was

22   diagnosed with HIV.  That happened in 2003.

23          It was three years later that he picked up his first

24   drug trafficking charges.  If you look at all the drugs that

02:36 25   he's been involved with in the past, it's primarily been

1   methamphetamine.  Methamphetamine has a role with a lot of

2   individuals who pursue homosexuality lifestyles.  There's no

3   denying that.  Mr. O'Hearn was involved in these relationships.

4   He got involved in drugs, initially recreationally, and then

02:37  5   they took over a significant aspect of his life, and the timing

6   of it all made sense:  How he stopped that career, how he lost

7   positive relationships in his life, and how he spiralled and

8   snowballed out of control, both with the illness and the drug

9   use and the trafficking.

02:37  10        He got himself in a lot of trouble in Florida.

11  There's no doubt about it.  And while the 2006 case was open

12  and pending, he got himself in trouble again in 2008.  It all

13  happened in the same limited time period.  It ended about

14  16 years ago.  When he gets back here to Massachusetts, he did

02:37  15  have a number of jobs outside of the professional field, but

16  not withstanding, got himself back in this position again.  At

17  age 64, he's set to turn 65 next year, instead of planning out

18  his retirement, he's going to be spending a considerable amount

19  of time in jail.

02:38  20        I want the Court to know that despite how well my

21  client may look to your Honor from the bench, he's not in good

22  health.  He still suffers from HIV, according to his primary

23  care providers, who reviews his medical records.  His situation

24  is getting worse.  He is a cancer survivor.  According to

02:38  25  medical records, he has lesions that are growing on his body

1    again which are indicative of fact that the cancer may have

2    returned but it has not yet been fully and thoroughly

3    diagnosed.

4         No one knows if my client will live another

02:38  5    five years, another ten, another 15 or another 20.  The life

6    expectancy charts put him in the low 80s, but with his

7    underlying health conditions, which those actuarial tables

8    don't take into consideration, no one can predict with

9    certainty how many good years he has left.

02:38 10        Punishment in this case is absolutely warranted, as it

11   would be for any defendant involved in drug trafficking,

12   particularly at this level, but I would suggest to the Court

13   that the 16 and a half years that the government's advocated

14   for is more likely than not to translate to a life sentence for

02:39 15   this particular defendant and we would hope the Court would

16   impose a lower term of incarceration.

17        Thank you.

18        THE COURT:  Thank you, Mr. Calcagni.

19        Does the defendant wish to address the Court before

02:39 20   sentence is imposed?

21        MR. CALCAGNI:  Yes, your Honor.  There's a short

22   statement that Mr. O'Hearn wishes to read with your permission.

23        THE COURT:  He may do so.

24        THE DEFENDANT:  Your Honor, thank you for the chance

02:39 25   to speak on my behalf.  I wish to apologize to all impacted by

1    my actions, to include the community and its members adversely

2    affected by drugs.  I also wish to apologize to my family

3    members for the great pain and suffering I've caused them.  I

4    am deeply remorseful for my actions that have brought me here

02:39   5    today.

6         For most of my life, I lived a law-abiding lifestyle.

7    I was raised in a good home by good parents and a loving

8    family.  I obtained a good education and had a long career.  I

9    was married with kids but struggled with my sexuality.  I was

02:40  10    raised in a conservative Catholic home where sexuality was not

11    suggested.  As such, I married and raised a family.  As the

12    years passed, my family life predictably failed.

13         I was introduced to drugs.  I initially took them

14    recreationally, and as time passed, developed an addiction.  I

02:40  15    took them off and on, sometimes more than others.  Because of

16    them I made bad choices, some in Florida and some here in

17    Massachusetts.  I'm now paying a heavy price.

18         I'm a hundred percent clean.  There are no drugs in my

19    system, and I'm committed to keeping it that way.  I have done

02:41  20    everything in my limited power to be bound from this awful

21    predicament.  This includes my conduct in jail, the job I had

22    there and several courses I completed.

23         I am also doing my best to stay on top of my health

24    with the limited resources available to me.  I hope that my

02:41  25    conditions do not worsen while I'm incarcerated.  I'm just

1    about to turn 65 next month, and at my age and with my health,

2    only God knows how many good years I may have left.

3        Instead of planning or enjoying retirement, I am

4    behind bars.  I hope I live long enough to serve my sentence

02:41  5    and will be released back to the community in order to be

6    joined by my family and live the remaining years of my life at

7    peace without drugs or negative influences and, of course, on

8    the right side of the law.

9        Thank you very much.

02:42  10        THE COURT:  Thank you, Mr. O'Hearn.

11        Do counsel know of any reason why sentence ought not

12    to be imposed at this time?  Miss Ferguson?

13        MS. FERGUSON:  No, your Honor.

14        THE COURT:  Mr. Calcagni?

02:42  15        MR. CALCAGNI:  No, your Honor.

16        THE COURT:  All right, Mr. O'Hearn.  I will respond to

17    allocution, which is what we call the statement made by a

18    defendant before he or she is sentenced.  I am encouraged by

19    the apology, by your remorsefulness, by your efforts to change

02:43  20    your life.  That's all to the good.

21        But, Mr. O'Hearn, you are now the tenth member of this

22    drug trafficking conspiracy who I am charged with sentencing in

23    this case, and it is no pleasure.  You played a large role in

24    this violent criminal enterprise to distribute vast quantities

02:43  25    of methamphetamine throughout the greater Boston area and,

1    undoubtedly, caused great pain and suffering to vulnerable drug

2    addicts, as you know only too well as a recovering drug addict

3    yourself.

4    I am encouraged by your efforts of rehabilitation and

02:43  5    participation in the Restorative Justice matters that you've

6    told me about in your letter, but you and your fellow

7    co-conspirators are not the only ones for whom I must be

8    concerned today.  I have to think about the victims, that is

9    the innocent victims, of this horrific drug of methamphetamine,

02:44 10    which is an ever-increasing plague on our society, especially

11    here in the Northeast, and especially the pure version of

12    methamphetamine that is now prevalent and more pervasive than

13    ever before with terrible medical and psychological

14    consequences.

02:44 15    The only way to protect those victims is to send the

16    perpetrators of the crimes to jail for long enough to impress

17    upon them and anyone else who would commit such crimes that it

18    simply is not worth it.  That is why I necessarily now sentence

19    you to a very long prison sentence.

02:45 20    Pursuant to the Sentencing Reform Act of 1984 and

21    having considered the sentencing factors enumerated in Title 18

22    of the United States Code Section 3553(a), it is the finding of

23    this Court, that you, Patrick O'Hearn, are hereby committed to

24    the custody of the Bureau of Prisons, to be imprisoned for a

02:45 25    term of 180 months.  This term consists of 180 months on all

1    superseding counts, to be served concurrently.

2         The Court recommends participation in the Bureau of

3    Prisons Residential Drug Abuse Program due to your substance

4    use history and based on an informal prescreening performed by

02:45  5    the Probation Office.

6         Additionally, the Court makes a judicial

7    recommendation that you participate in the Probation Office's

8    so-called CARE program during any term of supervised release if

9    you are deemed to be an appropriate candidate.

02:46 10        Upon release from imprisonment, you shall be placed on

11   supervised release for a term of 3 years.  This term consists

12   of 3 years on all superseding counts, such terms to run

13   concurrently.

14        Within 72 hours of release from custody of the Bureau

02:46 15   of Prisons, you shall report in person to the District to which

16   you are released.

17        No fine is imposed as it is deemed that you do not

18   have the financial ability to pay a fine.

19        While under the Probation Office's supervision, you

02:46 20   are to comply with the following terms and conditions:  First,

21   you shall not commit another federal, state, or local crime.

22   You shall not unlawfully possess a controlled substance.  You

23   must refrain from any unlawful use of a controlled substance

24   and submit to one drug test within 15 days of release from

02:47 25   imprisonment and at least two periodic drug tests thereafter,

1    not to exceed 50 tests per year.  You are to cooperate with the

2    collection of a DNA sample as directed by the Probation Office

3    and you shall comply with the standard conditions that have

4    been adopted by this Court and are described in the Sentencing

02:47  5    Guidelines at Section 5D1.3(c), which will be set forth in

6    detail in the Judgment and Committal.

7         The following special conditions apply during your

8    supervised release:  You shall submit to substance use testing,

9    not to exceed 50 drug tests per year, to determine if you have

02:47 10    used a prohibited substance.  You must not attempt to obstruct

11    or tamper with the testing methods.  You must participate in a

12    mental health treatment program as directed by the Probation

13    Office and you are required to contribute to the costs of

14    evaluation, treatment, programming and/or monitoring of that

02:48 15    condition based upon your ability to pay or the availability of

16    third-party payment.

17         It is further ordered that you shall pay to the United

18    States a Special Assessment of $300, which shall be due and

19    payable immediately.

02:48 20         Mr. O'Hearn, you have a right to appeal this sentence.

21    If you choose to appeal, you must do so within 14 days.  If you

22    cannot afford an attorney, an attorney will be appointed on

23    your behalf.

24         Do you understand that?

02:48 25         THE DEFENDANT:  Yes, I do.

1          THE COURT:  Is there any further business then to come

2     before the Court in these proceedings?  Miss Ferguson?

3          MS. FERGUSON:  No, your Honor.

4          THE COURT:  Mr. Calcagni?

02:48  5          MR. CALCAGNI:  No, your Honor.

6          THE COURT:  Then we are adjourned.  Thank you.

7          MR. CALCAGNI:  Your Honor, I'm sorry.  May I ask the

8     Court to include a recommendation for placement?  It was in my

9     written submission.  It's FCI Danbury.

02:49 10          THE COURT:  You're asking for Danbury, Connecticut?

11          MR. CALCAGNI:  Yes.

12          THE COURT:  If the Bureau of Prisons deems the

13    appropriate security level to be appropriate there, I recommend

14    the Danbury facility in Connecticut.

02:49 15          MR. CALCAGNI:  Thank you, your Honor.

16          THE CLERK:  All rise.

17          (The Honorable Court exited.)

18          (Adjourned, 2:49 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8          I, Kristin M. Kelley, certify that the foregoing is a

9    correct transcript from the record of proceedings taken

10   October 25, 2024 in the above-entitled matter to the best of my

11   skill and ability.

12

13

14        /s/ Kristin M. Kelley              December 26, 2024

15        Kristin M. Kelley, RPR, CRR              Date
          Official Court Reporter
16

17

18

19

20

21

22

23

24

25